UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CARL D. LUNA,

               Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

               Defendant.

CASE NO.    C08-5581RJB-KLS

REPORT AND
RECOMMENDATION

Noted for June 12, 2009

Plaintiff, Carl D. Luna, has brought this matter for judicial review of the denial of his applications for disability insurance and supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4), and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 41 years old.[1] Tr. 37. He has an eighth grade education and past work

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

experience as a truck driver, garbage truck driver, steel laborer, child care attendant, and a general laborer. Tr. 30, 95, 101, 534, 567, 622.

On May 12, 2004, plaintiff filed applications for disability insurance and SSI benefits, alleging disability as of October 15, 2003, due to depression, anxiety, drug withdrawal symptoms, seizures, and stomach problems. Tr. 23, 75-77, 94, 504L-504P. His applications were denied initially and on reconsideration. Tr. 23, 37-38, 63, 69, 504B, 504D-504E, 504I. A hearing was held before an administrative law judge ("ALJ") on August 2, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 527-63. A supplemental hearing was held on October 9, 2007, at which plaintiff, represented by counsel, again appeared and testified, as did a medical expert and the same vocational expert. Tr. 564-627.

On February 29, 2008, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)     at step two, plaintiff had "severe" impairments consisting of dysthymia with periods of depression, a generalized anxiety disorder, drug and alcohol abuse, and a left knee injury;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings");

(4)     after step three but before step four, based on all of his impairments, including substance abuse, plaintiff had the residual functional capacity to perform work at the medium exertional level, with the further non-exertional limitations of performing simple, one to two step tasks, with less than occasional contact with the public, in a stable work environment where assigned tasks do not change, and with occasional (i.e., one-third of the time) loss of focus and concentration; but if plaintiff stopped using drugs and alcohol, plaintiff would have the residual functional capacity to perform work at the medium exertional level, with the further non-exertional limitations of being restricted to simple one to two step tasks, with less than occasional contact with the public;

(4)     at step four, plaintiff was unable to perform his past relevant work; and

(5)     at step five, based on all of his impairments, including the substance use disorders, no jobs existed in significant numbers in the national economy that

_____

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id. As discussed in greater detail below, if evidence of alcohol or drug abuse is present in the record, additional steps are required to determine if such abuse is a material contributing factor to the determination of disability. See 20 C.F.R. §§ 404.1535(a), 416.935(a).

plaintiff could perform; but if the substance abuse was stopped, there would be a significant number of jobs existing in the national economy that he could perform.

Tr. 23-35. The ALJ further found that because plaintiff would not be disabled if he stopped his alcohol and drug use, the substance abuse was a contributing factor material to the determination of disability, and thus the ALJ determined plaintiff to be not disabled. Tr. 35-36. Plaintiff's request for review was denied by the Appeals Council on June 20, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 404.981, § 416.1481.

On September 26, 2008,[3] plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3). The administrative record was filed with the Court on January 28, 2009. (Dkt. #11). Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

> (a) the ALJ failed to properly consider all of plaintiff's severe impairments;
>
> (b) the ALJ failed to properly evaluate the opinions of plaintiff's treating and examining physicians concerning his functional limitations in the absence of substance abuse;
>
> (c) the ALJ failed to properly assess plaintiff's credibility;
>
> (d) the ALJ erred in finding plaintiff's impairments, even in the absence of the substance use disorders, did not meet or equal Listing 12.04C;
>
> (e) the ALJ improperly assessed plaintiff's residual functional capacity; and
>
> (f) the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

---

[3]Plaintiff states he timely filed his complaint with the Court. As indicated, however, the record shows the complaint was filed more than sixty days after the Appeals Council denied his request for review. A party may obtain judicial review of the Commissioner's final decision by commencing a civil action in federal court "within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow." 42 U.S.C. § 405(g); 20 C.F.R. § 404.981, § 416.1581 (claimant may file action in federal court within 60 days after the date notice of the Appeals Council's action is received); 20 C.F.R. § 404.982, § 416.1582 (any party to Appeals Council's decision or denial of review may request time for filing action in federal court be extended). This "sixty-day time limit is not jurisdictional, but is instead a statute of limitation which the Secretary may waive." Banta v. Sullivan, 925 F.2d 343, 345 (9th Cir. 1991). As such, failure to file within the sixty-day time limit is an affirmative defense, which "is properly raised in a responsive pleading." Vernon v. Heckler, 811 F.2d 1274, 1278 (9th Cir. 1987) (citing Federal Rule of Civil Procedure 8(c)). Because the Commissioner failed to raise the statute of limitations as an affirmative defense in his responsive pleading, the issue is waived, and the undersigned will deal with this matter on its merits.

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      Alcoholism or Drug Abuse as a "Material Contributing Factor"

A claimant may not be found disabled if alcoholism or drug addiction would be "a contributing factor material" to the ALJ's determination" that he or she is disabled. Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)); 20 C.F.R. §§ 404.1535(a), 416.935(a) (requiring determination as to whether claimant's drug addiction or alcoholism is contributing factor material to determination of disability)). To determine whether a claimant's alcoholism or drug addiction is a materially contributing factor, the ALJ first must conduct the five-step disability evaluation process "without separating out the impact of alcoholism or drug addiction." Id. at 955.

If the ALJ finds the claimant is not disabled, "the claimant is not entitled to benefits." Id. If the claimant is found disabled "and there is 'medical evidence of [his or her] drug addiction or alcoholism,'" the ALJ proceeds "to determine if the claimant 'would still [be found] disabled if [he or she] stopped using alcohol or drugs.'" Id. (citing 20 C.F.R. §§ 404.1535, 416.935). If a claimant's current limitations "would remain once he [or she] stopped using drugs and alcohol," therefore, and those limitations are disabling, then the claimant's "drug addiction or alcoholism is not material to the disability," and he or she "will be deemed disabled." Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001).

II.     The ALJ's Step Two Analysis

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." 20 C.F.R. §§ 404.1520, 416.920. An impairment is "not severe" if it does not

"significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(iii), (c), 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

Plaintiff argues the ALJ erred in failing to find his asthma and wrist fractures constituted severe impairments. The undersigned disagrees. As noted by the ALJ, who found in relevant part:

> The claimant alleged a wrist injury . . . in June 2007; his initial workup was not particularly remarkable (exhibit F:184, 300-310). Later examinations did not show significant limitations (exhibit F:331-333), but revealed a wrist fracture, which was repaired . . . with only minimal residuals (exhibit F:294-299). Any limitations from that condition lasted, or will last, less than 12 continuous months. It is not a severe impairment.
>
> The claimant said that he used inhalers and medication for breathing problems, but there are no reports of significant pulmonary symptoms. He does not have a severe respiratory condition.

Tr. 26. These findings overall are supported by the substantial evidence in the record. See Tr. 142-44, 173-76, 180-82, 187-89, 303, 305, 310, 480, 482. Specifically, the record fails to show plaintiff has significant remaining functional limitations due to either of the above alleged impairments.

Plaintiff further argues, however, that the ALJ erred in failing to find his borderline intellectual functioning to be a severe impairment as well. The undersigned agrees. With respect to this impairment, the ALJ found that while there was "some evidence" plaintiff had "mild mental retardation or borderline intellectual functioning," that condition represented "the effect of substance abuse only," and thus was not "a discrete, medically-determinable impairment." Tr. 26. More specifically, the ALJ found that IQ testing scores contained in the record, which were indicative of borderline intellectual functioning, were obtained at a time when plaintiff was "actively using alcohol and/or drugs," rendering those scores invalid, and that

1   plaintiff's mental status examinations were consistent with this finding. Tr. 29.

2       It is not clear, though, that the objective medical evidence in the record fully supports the ALJ's

3   determination on this issue.  For example, in early January 2004, Kristine S. Harrison, Psy.D., evaluated

4   plaintiff, assessing him with a generalized anxiety disorder, recurrent, severe major depression without

5   psychotic features, alcohol abuse with occasional marijuana abuse, and a secondary diagnosis consisting of

6   rule out learning disorder and attention deficit hyperactivity disorder ("ADHD"). Tr. 474.  Dr. Harrison

7   felt it highly unlikely alcohol caused any of plaintiff's diagnosed impairments, although it was "not

8   entirely clear" whether abstinence would decrease the severity of – or what effect alcohol or drug

9   treatment would have on – those impairments. Id.  Dr. Harrison opined that his "combined psychological

10  impairments" and "possible underlying learning and attention disorders" were "disrupting his cognitive

11  processes," resulting in a number of moderate to marked cognitive limitations. Tr. 475.

12      Plaintiff was evaluated by Elmore Duncan, M.D., in early September 2004, who also diagnosed

13  him with a generalized anxiety disorder, severe, recurrent major depression, alcohol abuse, marijuana

14  abuse "by history in remission," and a "[p]robable learning disorder with features of" ADHD. Tr. 421.  In

15  terms of his alcohol use, plaintiff told Dr. Duncan he had had "more difficulty with drinking in the last six

16  months," but had been "clean" for two months. Tr. 418, 421.  In terms of his functioning, Dr. Duncan

17  opined:

18          The claimant is able to handle his own funds so long as he keeps a simple list of
            expenses and payments with use of cash and money orders like he has in the past.
19          Complex mathematics are difficult for him.  A payee will be required if alcohol abuse
            is present.
20
            The claimant has the ability to perform simple and repetitive tasks but not detailed and
21          complex tasks.  He can accept instructions from supervisors and interact with
            coworkers and the public in low key situations where there are not complex
22          expectations.  Truck driving as described would be a satisfactory employment were it
            not for his current psychiatric difficulties.  He has been able to perform work activities
23          on a consistent basis in the past.  Presently, he could not maintain regular attendance in
            the workplace because of his difficulty in concentrating, ease of distraction, and
24          difficulty solving normal everyday problems.  Either through medication or
            psychotherapy, or both, improvement in his ability to concentrate, develop confidence
25          in his skills, avoid any substance abuse, and develop an ability to [live or] deal with
            family problems will be required.
26
    Tr. 422.
27
        The record also contains a psychiatric review technique form completed by Cynthia Collingwood,
28
    Ph.D., in late September 2004, and affirmed by Timothy Gregg, Ph.D., in mid-February 2005, in which

plaintiff was found to have a learning disorder versus ADHD by history, major depression, a generalized anxiety disorder, and alcohol dependence in early remission. Tr. 491-99. Drs. Collingwood and Gregg assessed plaintiff with moderate difficulties in maintaining social functioning, as well as concentration, persistence or pace, but apparently did not attribute any of them to his diagnosed learning disorder/ADHD. See Tr. 491-501. At the same time, Dr. Collingwood and Dr. Gregg completed and affirmed respectively, a mental residual functional capacity assessment form, in which they found plaintiff had a number of more specific moderate to marked mental functional limitations based on the same diagnoses. Tr. 487-89.

On the other hand, Drs. Collingwood and Gregg found plaintiff could understand, remember and perform simple, repetitive tasks for a normal work day and workweek, with "occasional" interruptions from his psychiatric symptoms, which they felt "should improve with continued sobriety." Tr. 489-90. Dr. Collingwood and Gregg found plaintiff would be capable of meeting "his basic adaptive needs," but he would "have problems managing change or making realistic plans," and "would do best in a setting away from the public." Tr. 490. Further, it seems that with respect to at least this assessed residual functional capacity, Drs. Collingwood and Gregg may have felt the mental functional limitations contained therein were at least partly due to plaintiff's learning disorder/ADHD. See Tr. 489.

In early January 2007, plaintiff was evaluated by Jeffrey Bremer, Ph.D., who diagnosed him with dysthymia, a panic disorder with agoraphobia, alcohol and methamphetamine dependence, and borderline intellectual functioning. Tr. 341. Dr. Bremer found plaintiff was moderately limited in his ability to learn new tasks secondary to his "borderline intellectual capacity," with this limitation most likely not being the result of alcohol or drug abuse. Tr. 342. In late April 2007, Trevelyan Houck, Ph.D., evaluated plaintiff as well, diagnosing him with: a dysthymia disorder; a major depressive disorder, single episode; a partial panic disorder with agoraphobia; alcohol dependence in reported early full remission; and borderline intellectual functioning. Tr. 318. Based on plaintiff's self-report of being clean and sober since December 2006, Dr. Houck found no indication of alcohol or drug abuse, nor did Dr. Houck feel any of the moderate cognitive limitations he found were likely the result of such abuse. Tr. 318-19.

Lastly, Dr. Kenneth Asher, the medical expert who testified at the hearing that the record showed plaintiff had: borderline low intellectual functioning; mild mental retardation; a dysthymic disorder with periods of depression; "relatively mild to moderate" chronic depression; general anxiety disorder, both "possibly with panic" and "probably chronic and persisting with periods of more intense anxiety"; and

alcohol and methamphetamine abuse "over a long period of time." Tr. 601-02. Dr. Asher further testified that these conditions were all "complicated" by his "ongoing substance abuse." Tr. 601. More specifically in terms of the effect the alcohol abuse had on plaintiff's intellectual functioning, Dr. Asher testified in relevant part that:

> . . . He was evaluated in early 2007, a fairly thorough psychiatric evaluation which found his overall intellectual functioning in the lower borderline range, including a verbal IQ of 70 or 67 I think, lower than 70. However, . . . [t]his was either too soon after his cessation of substance abuse or possibly during the period when he was still affected by drugs and alcohol. So that score, and those findings which are pretty low, are probably . . . a lower estimate than his functioning would be when he's fully sober and clean and has been so for a year or so.

Tr. 601-02.

Dr. Asher went on to testify that he believed that basically plaintiff's functioning was "reduced by the continued alcohol consumption," and that "were he to be in full remission" and take advantage of both substance abuse and psychological treatment, "his functioning would improve considerably." Tr. 602. In addition, Dr. Asher testified that the questions about "the persistence of substance abuse" kept the validity of the intellectual functioning testing results "an open question." Tr. 603. More specifically, Dr. Asher testified that after he had had "a year of sobriety," there would be an "at least 50 percent likelihood that" plaintiff would "be able to return to his functional level of several years ago," and that there would be "a much higher likelihood that his functioning would improve from the present level to . . . better than he's functioning now." Tr. 608-09.

Dr. Asher testified that in terms of concentration, persistence and pace, if plaintiff was clean and sober for a year, "there would be less dysfunctionality or less decompensation potential than now," which, with the presence of substance abuse, he testified was "markedly impaired." Tr. 604, 609-10. Dr. Asher further testified, however, that plaintiff's functioning in those areas would continue to be moderately impaired, because he "would continue to have some kind of cognitive problems." Tr. 605, 610. Once more, in terms of plaintiff's "low cognitive functioning" test results – with his verbal IQ score falling "in the mildly, mentally retarded range" – Dr. Asher testified that he did not know if that score was valid, because of "the recency of his substance abuse" and "the possibility that there was something still going on." Tr. 610. Dr. Asher did conclude in relevant part though that:

> . . . [I]f [we] were to be fully confident that he's been in remission for many months, roughly a year, and were retested, I'm estimating that his scores would rise

some, but they would still be well below average. . . .
. . .
. . . Word reading would probably be about the same . . . below average. . . .
simple arithmetic . . . wouldn't improve much, but it probably [would] improve a few
points. Those will still be below average, no question about it. Spelling, I wouldn't
expect to improve. And so these would still be below average . . .

Tr. 610-11. Thus, Dr. Asher agreed that while plaintiff would be "doing better psychiatrically" if he were

to be "in full remission," he did not think he would "reach the average range" in regard to his intellectual

functioning. Tr. 611.

As can be seen, contrary to the ALJ's statement, there is a substantial amount of objective medical

opinion source evidence in the record not only indicating that plaintiff's borderline intellectual functioning

and/or mild mental retardation was not necessarily caused or affected by his substance abuse, but that he

might continue to have significant cognitive limitations stemming from such low intellectual functioning

even if he were found to be in full remission. In addition, while it certainly may be that plaintiff's "mental

status examinations" are more consistent with the ALJ's determination that his low IQ scores are far more

reflective of the presence of active substance abuse than not, the ALJ did not specify which mental status

examinations showed this, nor did she explain why those examinations should be given greater weight

than the other objective findings and medical source opinions discussed above. On the other hand, in light

of this evidence, it is not entirely clear that a determination of severity is warranted here, given that it also

is not entirely clear the exact effect plaintiff's substance abuse had on his intellectual functioning. As

such, the undersigned finds remand for further consideration of this issue is appropriate here.

III.     The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in

the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion

must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th

Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact

inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

"falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Id.</u> The ALJ also may draw inferences "logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>Lester</u>, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

Plaintiff argues the ALJ failed to properly evaluate the medical opinion evidence from his treating and examining physicians, including Dr. Harrison, Dr. Duncan, Dr. Houck, and Dr. Bremer. Plaintiff also asserts the ALJ failed to properly evaluate the opinion evidence from Paul Williams, M.D., Anjan Sattar, M.D., Keith V. Anderson, M.D., and Sandra Ritland, M.D. Plaintiff argues the medical opinions provided by these sources establish that both his physical and mental impairments significantly impaired his ability to work, even absent his substance abuse. The undersigned agrees the ALJ erred in his evaluation of these

medical opinion sources, and, accordingly, recommends that remand for further consideration thereof here is warranted as well.  Each such source shall be dealt with individually below.

A.  <u>Dr. Harrison</u>

As noted above, Dr. Harrison felt it was highly unlikely alcohol caused any of plaintiff's diagnosed impairments, although she was not "entirely clear" whether abstinence would decrease their severity. Tr. 474.  Also as noted above, she opined that those impairments were "disrupting his cognitive processes," resulting in a number of moderate to marked cognitive limitations. Tr. 475.  In particular, Dr. Harrison found plaintiff was markedly limited in his ability to exercise judgment and make decisions, moderately to markedly limited in his ability to learn new tasks, and moderately limited in his ability to perform routine tasks. <u>Id.</u>  While Dr. Harrison did state that it was "unclear" whether these limitations were most likely the result of alcohol or drug abuse, again she felt it that to be "doubtful". <u>Id.</u>

In addition to the above cognitive limitations, Dr. Harrison found plaintiff's impairments resulted in several other social limitations as well, including a marked limitation in his ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting, and a moderate limitation in his ability to relate appropriately to co-workers and supervisors, interact appropriately in public contacts and care for himself. <u>Id.</u>  The ALJ summarized the findings provided by Dr. Harrison, but did not set forth any analysis thereof. <u>See</u> Tr. 27-28.  It is clear, though, that in assessing plaintiff's residual functional capacity in the absence of his substance abuse, the ALJ did not adopt many of the mental functional limitations Dr. Harrison found, given that the ALJ limited him only to "simple 1-2 step work with less than occasional contact with the public." Tr. 32.  In addition, while, as noted above, Dr. Harrison admitted that it was not exactly clear what the effect the substance abuse had on his cognitive impairments and limitations, she did feel that any such effect was "doubtful" or "highly unlikely." Tr. 475. In any event, there is no indication Dr. Harrison believed plaintiff's social limitations were affected by his substance abuse.

B.  <u>Dr. Duncan</u>

As noted above, in early September 2004, Dr. Duncan opined in relevant part that plaintiff could perform simple, repetitive tasks, accept instructions from supervisors and interact with co-workers and the public "in low key situations where there are not complex expectations." Tr. 422.  Dr. Duncan opined as

well, though, that plaintiff "could not maintain regular attendance in the workplace because of his difficulty in concentrating, ease of distraction, and difficulty solving normal everyday problems." Id. Also as noted above, plaintiff reported at the time that he had been clean and sober for two months, although he had had "more difficulty with drinking in the last six months." Tr. 419. In terms of future functioning, Dr. Duncan emphasized the importance of mental health treatment and avoiding substance abuse. Id.

In rejecting the above limitations, the ALJ focused on Dr. Duncan's opinion that plaintiff "needed further treatment and avoidance of substance abuse." Tr. 28. The ALJ further stated that the report issued by Dr. Duncan showed that when plaintiff was "abusing alcohol, he was unable to sustain sufficient focus and concentration." Id. Dr. Duncan, however, gave no real indication that he felt plaintiff's alcohol abuse was causing the mental functional limitations he found. It is true that Dr. Duncan stated "[a] payee" would be necessary if such abuse was present, and did feel that avoidance of such abuse was needed, but this does not mean he actually felt such abuse was present or was affecting plaintiff's current ability to function. While Dr. Duncan's view of plaintiff's substance abuse issues appears to have depended entirely on what plaintiff self-reported and, as discussed herein, it is not entirely clear such abuse was under control at the time of this evaluation, the undersigned finds the ALJ provided an insufficient basis for concluding all of the limitations found by Dr. Duncan were the result of alcohol abuse.

C.    Dr. Houck

In early July 2004, Dr. Houck evaluated plaintiff, and diagnosed him at the time with alcohol dependence, an adjustment disorder with mixed anxiety and depression and a rule out personality disorder. Tr. 357. Dr. Houck stated that plaintiff's abuse of alcohol both caused and worsened these conditions. Tr. 357-58. Plaintiff was noted to be markedly limited in his ability to respond appropriately to and tolerate the pressure and expectations of a normal work setting, and moderately limited in his ability to: exercise judgment and make decisions; relate appropriately to co-workers and supervisors; interact appropriately in public contacts; control his physical or motor movements; and maintain appropriate behavior. Tr. 358. Dr. Houck, however, did not feel the limitation on exercising judgment and making decisions was likely due to plaintiff's substance abuse. Id. On the other hand, Dr. Houck did feel mental health intervention would not likely restore plaintiff's ability to work until he stopped drinking. Tr. 359.

With respect to this evaluation, the ALJ stated that he gave it "some weight," but found Dr. Asher's

testimony was "better supported." Tr. 28.  Dr. Asher testified that without the presence of substance abuse, plaintiff would continue to have moderate difficulties in maintaining social functioning, and his difficulties in maintaining concentration, persistence or pace would improve from marked to moderate. Tr. 604-05. Dr. Asher, however, did not provide any testimony as to the more specific limitations found by Dr. Houck above.  In addition, the more general mental functional limitations as to which Dr. Asher did testify, are not necessarily inconsistent with some of those Dr. Houck found, such as the moderate limitations on relating appropriately to co-workers and supervisors, interacting appropriately in public contacts and maintaining appropriate behavior.  Dr. Houck, furthermore, opined that while plaintiff's current ability to function was affected by alcohol abuse, such was not the case with respect to the marked limitation in responding appropriately to and tolerating the pressures and expectations of a normal work setting. Accordingly, here too the ALJ did not provide sufficient reasons for rejecting Dr. Houck's findings.

Also, as discussed above, Dr. Houck evaluated plaintiff again in late April 2007.  This time, based on plaintiff's self-report of being clean and sober, Dr. Houck found no indication of alcohol or drug abuse. Tr. 318-19.  In addition, while Dr. Houck did find plaintiff had moderate limitations in certain cognitive areas, including the ability to learn new tasks and exercise judgment and make decisions, those limitations were not felt to be most likely the result of alcohol or drug abuse. Id.  Dr. Houck further found him to be markedly limited in his ability to interact appropriately in public contacts and respond appropriately to and tolerate the pressures and expectations of a normal work setting, and moderately limited in his ability to relate appropriately to co-workers and supervisors, control his physical or motor movements and maintain appropriate behavior. Id.  Again, Dr. Houck did not feel any of these limitations were caused by alcohol or drug abuse. Tr. 318-19.

In her decision, the ALJ stated that the "mental status score" plaintiff obtained at the time, was not consistent with the "significant restrictions" found by Dr. Houck in her evaluation report. Tr. 34.  The ALJ also noted Dr. Houck thought plaintiff's "substance abuse was in remission," which the ALJ stated "better" explained the "good" mental status score. Id.  It is unclear, however, exactly what that mental status score meant in terms of plaintiff's functioning, and why the ALJ found that the score in and of itself sufficient to discount all of Dr. Houck's other findings.  Nor does the ALJ give any basis for finding Dr. Houck's belief that plaintiff's substance abuse was in remission better explained the mental status score.

Indeed, the fact that Dr. Houck found plaintiff continued to have significant mental functional limitations despite substance abuse remission, further indicates that abuse may not have been as material a factor in plaintiff's functional limitations as the ALJ makes it appear to be.

D.     <u>Dr. Bremer</u>

In early January 2007, Dr. Bremer found, as discussed above, that plaintiff was moderately limited in his ability to learn new tasks secondary to his "borderline intellectual capacity," with this limitation most likely not being the result of alcohol or drug abuse. Tr. 342. In addition, Dr. Bremer found plaintiff to be markedly limited in his ability to interact appropriately in public contacts and respond appropriately to and tolerate the pressure and expectations of a normal work setting, and moderately limited in his ability to relate appropriately to co-workers and supervisors, control his physical or motor movements and maintain appropriate behavior. <u>Id.</u> Also as discussed above, the ALJ's basis for discounting Dr. Bremer's findings concerning plaintiff's borderline intellectual functioning and related limitation was insufficient. The ALJ, furthermore, gave no reasons for not adopting the other limitations found by Dr. Bremer.

It is true that Dr. Bremer felt drug or alcohol abuse treatment likely would decrease the severity of his mental health condition. Tr. 341. On the other hand, Dr. Bremer also opined that plaintiff likely would "[s]till be anxious and depressed" after sixty days of abstinence. <u>Id.</u> Thus, it is not clear the extent which, if any, Dr. Bremer believed the other social mental functional limitations were caused or otherwise affected by drug and/or alcohol abuse. Accordingly, here too, remand for further consideration of these limitations, as well as the other moderate cognitive limitation Dr. Bremer found, is warranted.

E.     <u>Dr. Williams</u>

In early September 2004, Paul Williams, M.D., plaintiff's treating physician, completed a state agency physical evaluation form, in which he diagnosed plaintiff with anxiety, a bipolar disorder and a left knee contusion, all of which were deemed to be severe impairments – i.e., resulting in the "[i]nability to perform one or more basic work-related activities." Tr. 352. Specifically, he opined that plaintiff's anxiety and bipolar disorder severely affected his ability to communicate and understand or follow directions, and his left knee contusion severely affected his ability to sit, stand, walk, lift and carry. <u>Id.</u> In terms of ability to perform work, Dr. Williams also found plaintiff to be severely limited, meaning he was "unable to lift at least 2 pounds or unable to stand and/or walk." <u>Id.</u>

Dr. Williams further opined, however, that plaintiff's anxiety and bipolar disorder were "probably caused or aggravated by alcohol or drug abuse." Tr. 353. In addition, Dr. Williams stated that despite him being 60 days "free from alcohol" at the time, plaintiff's "problems" were still severe, and therefore he did not recommend alcohol or drug treatment. Id. On the other hand, Dr. Williams believed plaintiff would be able to participate in "pre-employment activities such as job search or employment classes." Id.

With respect to the opinion given by Dr. Williams that plaintiff was severely limited in his ability to work – in that he would be "unable to lift at least 2 pounds or stand and/or walk" – the ALJ stated that this opinion "was apparently based on a conclusion that" plaintiff "could not bend, stand for prolonged periods, or walk 'distances'." Tr. 33. The ALJ, however, found that report to be contradicted by plaintiff's "intact functioning," and thus that the "physical assessment" provided by Dr. Williams was "not persuasive." Id. The undersigned agrees with the ALJ that the restriction to a severely limited ability to work based on the diagnosis of a left knee contusion is not supported by substantial evidence.

First, Dr. Williams' own treatment notes fail to support the type of severe physical restrictions set forth above. In late August 2004, for example, Dr. Williams examined plaintiff's left knee, noting that it appeared to have "quite a bit of fluid," and that tenderness was present. Tr. 400. Both collateral ligament weakness and ligament instability were noted as well. Tr. 395. In his evaluation report itself, Dr. Williams found plaintiff had a swollen left knee, that he had decreased knee range of motion and that he walked with a limp. Tr. 351. None of those findings, however, appear in any of Dr. Williams' prior progress notes. In addition, in late November 2004, and again in early January 2005, Dr. Williams found plaintiff to have a "[n]ormal gait," with no further left knee-related symptoms noted. Tr. 392-93.

Nor does the other objective medical evidence in the record support the severe physical limitations found by Dr. Williams. In early September 2004, Scott C. Slattery, M.D., noted that plaintiff's left knee swelling had improved, that there was only "mild palpation tenderness," that active extension was full, and that flexion was largely comfortable. Tr. 410. Further, the knee was neurovascularly intact, with no instability. Id. Plaintiff was told that the "healing time" would be "approximately two months," and that he should "do well with conservative treatment." Id. Similar findings were made by Dr. Slattery in early October 2004, and by Keith V. Anderson in early November 2004. Tr. 407, 409. In late November 2004, plaintiff reported "doing better," with the left knee "close to 90% normal function." Tr. 406. Dr. Slattery

found "[n]o limitations" at that point, "apart from deep knee bending/squatting." Id.

As to the mental functional limitations Dr. Williams found were caused by plaintiff's anxiety and bipolar disorder – i.e., severe limitations in his ability to communicate and understand or follow directions – the ALJ did not specifically address them. Rather, the ALJ noted that during the period when plaintiff was being treated by Dr. Williams, his "remarkably jittery and nervous psychomotor agitation improved when he abstained from alcohol and drugs, and attended drug counseling," but "he apparently continued to use some alcohol and methamphetamine." Tr. 28. Indeed, as discussed above, Dr. Williams himself felt that alcohol and drug abuse probably caused or aggravated plaintiff's bipolar disorder and anxiety. Tr. 353. Accordingly, the undersigned cannot fault the ALJ for not adopting the specific severe mental functional limitations Dr. Williams opined resulted from those two conditions.

F.      Dr. Sattar

Plaintiff was evaluated in early March 2005, by Anjan Sattar, M.D., who diagnosed him with a recurrent major depressive disorder, alcohol abuse with continuous usage, methamphetamine abuse in early, fragile remission, and an impulse control disorder. Tr. 373. Dr. Sattar also provided the following further assessment:

> [Plaintiff has] a long history of [a] moderate degree of depression. He has been self-medicating recently with alcohol and drugs. His symptoms of depression have worsened by his ongoing struggle with his wife, as well as his consumption of illicit drugs. That may, in fact, explain the ineffectiveness of the medications he is currently taking. Other than that, he also has significant anger control problems and impulse control problems, and that may suggest a personality disorder, but I do not have enough information to diagnose him with that and therefore, a diagnosis of Impulse Control Disorder, NOS, was made.

Id. In her decision, the ALJ observed that Dr. Sattar noted plaintiff's "ongoing use of drugs exacerbated his depression, and interfered with his prescribed medication," and that while plaintiff reported at that time "that he seemed a bit tearful and constricted," he otherwise was "intact without psychomotor changes." Tr. 28; see also Tr. 371-73.

The substantial evidence in the record supports the ALJ's determination that the mental functional limitations found by Dr. Sattar here were significantly affected by plaintiff's on-going use of alcohol and drugs. For example, while plaintiff reported he "quit taking" his medications "because they didn't work" for him, Dr. Sattar felt the "consumption of illicit drugs" likely explained "the ineffectiveness" thereof. Tr. 372-73. Indeed, Dr. Sattar believed plaintiff "might be minimizing his consumption of drugs and alcohol,"

1  and, as noted above, he further commented that plaintiff had been self-medicating with those substances,

2  and specifically diagnosed him with "[c]ontinuous" alcohol usage. Tr. 372-73. The undersigned, therefore,

3  finds the ALJ did not err in her evaluation of Dr. Sattar's findings and opinion.

   G.    Dr. Ritland

5      In early July 2007, plaintiff saw Sandra Ritland, M.D., who diagnosed him with a mood disorder,

6  insomnia "probably related to [the] mood disorder" and mania. Tr. 192. Dr. Ritland commented at the

7  time that plaintiff was "very agitated and anxious," had pressured speech and presented "in a manic state."

8  Id. She further noted, however, that she detected no thought disorder, did not appear to have a memory

9  deficit, was "well oriented," and had no suicidal ideation. Id. In mid-July 2007, furthermore, plaintiff

10 reported that there had been "an improvement in his sleep," although he felt tired on one of his

11 medications, and that he "had less anxiety." Tr. 189. Upon examination, plaintiff appeared "calmer and

12 less nervous," he had "good thought order," with no pressured speech, memory deficit or sign of suicidal

13 ideation, and presented as not having any agitation. Id.

14     Plaintiff reported in late July 2007, that medication helped his anxiety. Indeed, upon examination,

15 plaintiff appeared only "a little agitated and anxious," again with no thought disorder or any delusions or

16 hallucinations. Tr. 188. Plaintiff was well spoken, and once more his memory was intact and he expressed

17 no pressured speech or suicidal ideation. Id. Dr. Ritland, though, did diagnose him with a "very severe"

18 generalized anxiety disorder, most likely related to his mood disorder, which Dr. Ritland further noted had

19 benefitted from medication. Id. In late August 2007, plaintiff still only exhibited "mild nervousness and

20 anxiety," and his mental status examination otherwise was unremarkable. Tr. 187.

21     Plaintiff argues the ALJ did not properly evaluate the symptoms of insomnia, agitation, anxiety,

22 and mania noted by Dr. Ritland. But as the above progress notes from Dr. Ritland indicate, she largely

23 found plaintiff's agitation and anxiety to have decreased to merely a mild level by late August 2007, as a

24 result of the effectiveness of his medication. Mental status findings at the time also indicate plaintiff's

25 symptoms of mania largely had improved by then as well, as apparently had his sleep. As such, the

26 undersigned finds that here too no error was committed by the ALJ.

   H.    Dr. Anderson

28     Dr. Anderson treated plaintiff for his left wrist complaints in June, August and September 2007.

See Tr. 142-44, 152-53, 180-82.  Plaintiff argues the ALJ failed to properly evaluate the Dr. Anderson's findings stemming from that treatment, but fails to set forth with any specificity in exactly what way the ALJ erred.  Indeed, as noted above, the objective medical evidence in the record, including the treatment notes obtained from Dr. Anderson (see id.), fail to establish that plaintiff's left wrist injury constituted a severe impairment, or that any residual functional limitations, significant or otherwise, resulted therefrom.  Thus, the undersigned finds no error on the part of the ALJ here.

IV.     The ALJ's Assessment of Plaintiff's Credibility

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d

700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

In terms of the ALJ's credibility determination in this case, she first found that when considering all of plaintiff's impairments, including his substance use disorders, he was "credible" regarding his "anxiety, agitation, and significant loss of concentration and focus." Tr. 27. Plaintiff argues the ALJ erred, however, by not explaining why his other testimony – regarding, for example, his alleged nightmares, need to take naps during the day and trouble understanding what he reads – was not credible as well. The undersigned, though, fails to see any error here, given that the above credibility determination concerned his allegations of disability in light of all of his impairments, including the substance abuse, and that the ALJ went on to find him to be disabled based on those impairments. See Tr. 30.

As noted by plaintiff, the ALJ subsequently provided a second, additional credibility determination, which reads in relevant part as follows:

> These reports [from the medical sources in the record] show that the claimant has some symptoms and limitations, but not to the point of disability when substance abuse is not considered. Other evidence supports that conclusion. The claimant testified that he continued to ride a bicycle, and he collected bees' nests for some reason. He managed his personal care and did some household chores. The claimant said that he had watched his wife's young infant child when his wife worked; this was a full-time occupation. He told Dr. Duncan that he walked his dog and attended appointments (exhibit F:86). These activities are consistent with the residual functional capacity determined in this matter, when he is not drinking or using drugs.

> The claimant said that he could not perform his past work as a truck driver because he had lost his commercial license due to drunk driving violations. That suggests that he is capable of working, but for the effect of his substance abuse.

> For these reasons, the claimant's subjective reports are not entirely credible. He has had multiple driving offenses involving alcohol (exhibit E:55), and his stories of

> babysitting and other tasks were not consistent. He tended to minimize his substance
> abuse, and his medical reports were often affected by acute intoxication or withdrawal.

Tr. 34-35. Plaintiff argues the ALJ's credibility determination overall was improper, because this second credibility determination is contradicted by the earlier one she provided. But this ignores the plain fact that the differences between the two are the result of the ALJ separating out the effects of plaintiff's substance abuse. As such, the undersigned sees no contradiction in the ALJ's findings here.

Plaintiff also argues the ALJ did not provide any clear, specific reasons for her decision to discount his credibility in the absence of his substance abuse. The undersigned disagrees. As noted by the ALJ, and as discussed above, while it is not exactly clear what the nature and extent of plaintiff's mental functional limitations would be absent such disorders, the record does contain a fair amount of objective medical evidence that his functioning has been significantly, adversely effected by his alcohol and drug use at times. The activities the ALJ notes further adversely affects the credibility of plaintiff's allegations that he is incapable of performing any work. See Smolen, 80 F.3d at 1284 and n. 7 (to determine if symptom testimony is credible, ALJ may consider daily activities; such testimony may be rejected if claimant is able to spend substantial part of his or her day performing activities transferable to work setting). Finally, as noted above, the record supports the ALJ's statement that plaintiff has tended to minimize the nature and effects of his substance abuse at times, which also is a valid reason for discounting his credibility. See id. (ALJ may consider testimony that appears less than candid).

V.      The ALJ's Step Three Determination

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d), § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id. The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098. However, "[a] generalized assertion of functional problems is not enough to establish disability at step three." Id. at 1100 (citing 20 C.F.R. § 404.1526).

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."

20 C.F.R. § 404.1508, § 416.908.  It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id.; see also SSR 96-8p, 1996 WL 374184 *2 (determination that is conducted at step three must be made on basis of medical factors alone).  An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

An impairment, or combination of impairments, equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id.; see also Sullivan v. Zebley, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.") (emphasis in original).  However, "symptoms alone" will not justify a finding of equivalence. Id.  The ALJ also "is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005).

Plaintiff argues the ALJ erred in finding that absent his substance abuse, none of his impairments would meet or equal the criteria of Listing 12.04C.  That Listing provides:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met . . . when the requirements in C are satisfied. . . .
>
> . . .
>
> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  In her decision, the ALJ found in relevant part as follows:

> If the claimant stopped the substance use, the remaining limitations would not meet or medically equal the criteria of [Listing] 12.04 . . .  Dr. Asher testified that if the substance abuse was stopped, the claimant would have mild restriction [sic] in activities of daily living, moderate difficulties is [sic] social functioning, concentration, persistence or pace, and perhaps one episode of decompensation if the substance abuse was stopped.
>
> Dr. Asher's testimony is given substantial weight, because he had access to the entire record.  The record does not show any episode of decompensation for an extended period since the alleged onset date.  However, to give the claimant the benefit of any doubt, it would appear that his ongoing condition has resulted in occasional symptoms that may be construed as one period of decompensation.
>
> . . . The undesigned has . . . considered whether the "paragraph C" criteria would be satisfied.  According to Dr. Asher, these criteria would not be met if the claimant stopped the substance use.  That testimony was not refuted, and it is adopted.

Tr. 31.

Plaintiff argues the ALJ erroneously stated that Dr. Asher testified that his mental impairments did not meet the criteria of Listing 12.04C.  Specifically, plaintiff asserts that Dr. Asher testified that in light of all of his impairments, including his substance abuse, plaintiff's condition met those criteria.  But the issue here is not whether plaintiff's condition met the criteria of that Listing considering all of his impairments – again, given that the ALJ went on to find plaintiff disabled with the substance use disorders at step five of the sequential disability evaluation process – but whether the ALJ's step three determination in the absence thereof is supported by Dr. Asher's testimony.  Plaintiff further argues that because Dr. Asher went on to testify that his mental health problems and substance dependency were intertwined, and that after a year of sobriety, his anxiety and depression would not be at Listing-level severity, the record supports a finding of disability at least through December 2007.  But this argument merely supports a finding of disability with the continued presence and effects of plaintiff's substance abuse.

Plaintiff does argue as well that Dr. Asher testified that while he believed plaintiff's functioning would be "somewhat improved" after a year of sobriety, he did not really know by how much. See Tr. 617.  Dr. Asher did testify, however, that "a conservative estimate would be 25 percent better." Id.  In addition, while such testimony might support, as discussed elsewhere herein, a more restrictive residual functional capacity assessment than provided by the ALJ, it hardly supports a finding of disability at step three of the sequential disability evaluation process.  Indeed, Dr. Asher expressly testified that in his opinion, plaintiff's condition would not meet the criteria of Listing 12.04C if he did not use alcohol or drugs. Tr.

607.  More specifically, although Dr. Asher did testify that plaintiff "certainly" was "in that gray zone," and did have "difficulties", if he were to be "fully abstinent for a year or for many months approaching a year, . . . his anxiety and depression would not meet listing level, would not be that severe." Id.

Plaintiff argues in addition that an early October 2007 evaluation form completed by Dr. Bremer, which was submitted for the first time to the Appeals Council, supports a finding of disability at step three as well, because he opined therein that "no signs of improvement" were shown since the previous, early January 2007 evaluation, and because anxiety and depression were still present, even with medication.  See Tr. 518-22.  Even if it were proper for this Court to remand this matter for an award of benefits or for further administrative proceedings on this basis – a finding the undersigned declines to make here, given the lack of argument on this issue[4] – that new evidence would not, even when combined with Dr. Asher's testimony, support a finding that Listing 12.04C had been met or equaled.

As discussed above, Dr. Asher's testimony does not show he believed plaintiff's mental condition met or equaled the criteria of Listing 12.04C absent the substance abuse.  The early October 2007 report provided by Dr. Bremer, furthermore, like that of his prior, early January 2007 report, contains no findings that any of the specific "C" criteria had been met or equaled, although in both cases, Dr. Bremer did find plaintiff had marked to severe limitations in some areas of social functioning.  See Tr. 342, 520.  However, different, additional clinical findings are needed to result in a "C" criteria disability finding, and plaintiff has not pointed to, nor can the undersigned find any, evidence in either of Dr. Bremer's reports that would rise to that level of impairment.

Plaintiff's wholly general statement that the medical opinion evidence from Drs. Harrison, Houck and Ritland, combined with that from Dr. Asher and Dr. Bremer, supports a step three finding of disability also is not well-taken.  Plaintiff must do more than merely make such a broad assertion.  Rather, he must point to specific findings in that opinion evidence establishing that the criteria of Listing 12.04C were met or equaled.  Indeed, none of those medical opinion sources opined as to whether plaintiff's impairments and limitations, in the absence of his substance abuse, rose to Listing-level severity, or made any findings

---

[4]See Mayes v. Massanari, 276 F.3d 453, 461 n.3 (9th Cir. 2001) (expressly holding it had not decided whether good cause is required to review evidence submitted for the first time to the Appeals Council, or whether it is required only when such evidence is submitted for the first time to district court).  This is not to say, however, that Dr. Bremer's early October 2007 report cannot or should not be considered on remand, since remand is being recommended here on other bases.

.

1  that would indicate the specific criteria set forth therein had been met or equaled.  Lastly, the undersigned

2  rejects plaintiff's argument that the ALJ erred by not complying with an internal agency policy in finding

3  plaintiff's mental condition did not meet or equal those criteria, as he did not present that argument in his

4  opening brief as required for proper consideration thereof.

5  VI.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

6           If a disability determination "cannot be made on the basis of medical factors alone at step three of

7  the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

8  assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

9  claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or

10 she can do his or her past relevant work, and at step five to determine whether he or she can do other work.

11 Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

12          A claimant's residual functional capacity is the maximum amount of work the claimant is able to

13 perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

14 must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only

15 those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

16 claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional

17 limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other

18 evidence." Id. at *7.

19          As noted above, the ALJ found that in the absence of the substance use disorders, plaintiff had the

20 residual functional capacity to perform medium work, with the additional limitations that he would be able

21 to perform only "simple 1-2 step work with less than occasional contact with the public." Tr. 32.  Plaintiff

22 argues this RFC assessment is not supported by the substantial evidence in the record, asserting

23 specifically that it failed to take into account the findings from his treating and examining physicians.  The

24 undersigned agrees that because the ALJ did so err to the extent discussed above, her assessment of

25 plaintiff's residual functional capacity absent the substance abuse cannot be said with any certainty to

26 include all the mental functional limitations supported by the medical evidence in the record.

27          Plaintiff further argues the ALJ erred by not including all of the mental functional limitations found

28 in the mental residual functional capacity form completed by Dr. Collingwood and affirmed by Dr. Gregg,

in late September 2004, and mid-February 2005, respectively.  As discussed above, they found plaintiff to

be moderately to markedly limited in a number of mental functional areas, including markedly limited in his ability to interact appropriately with the general public, and moderately limited in his ability to: understand, remember and carry out very short and simple instructions; maintain attention and concentration; perform activities within a schedule; maintain regular attendance; be punctual; complete a normal workday and workweek; perform at a consistent pace; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. Tr. 487-89.

Also as discussed above, Drs. Collingwood and Gregg further opined in a narrative portion of that form that while plaintiff would be able to understand, remember and perform simple, repetitive tasks for a normal work day and work week, and could meet his "basic adaptive needs," he would have "occasional" interruptions from his psychiatric symptoms – although, again, they believed these "should improve with continued sobriety" – he would have "problems managing change or making realistic plans," and he would "do best in a setting away from the public." Tr. 489-90. As noted by plaintiff, the ALJ appeared to accept the findings of Drs. Collingwood and Gregg, at least in regard to performing simple, repetitive tasks with occasional interruptions, and doing best in a setting away from the public. See Tr. 34.

As further pointed out by plaintiff, however, the ALJ also apparently declined to adopt many of the other moderate and marked functional limitations found by Dr. Collingwood and Dr. Gregg, nor did the ALJ provide any reason for declining to do so. To that extent, the ALJ erred. For this reason as well, the ALJ's residual functional capacity assessment cannot be seen as reliably including all of plaintiff's mental functional limitations. On the other hand, because the ALJ did not err in discounting plaintiff's credibility as discussed above, the undersigned finds as well that the ALJ also did not error in failing to include any additional limitations alleged in his testimony.

The ALJ further did not err, as argued by plaintiff, in not including any limitations due to fatigue or insomnia based on the medical evidence obtained from Dr. Ritland or any alleged problems related to his wrist. As discussed above, the ALJ properly found his wrist injury did not constitute a severe impairment, given the lack of significant limitations in the record stemming therefrom, and did not improperly evaluate the evidence from Dr. Ritland. In addition, here too plaintiff did not present these as bases for challenging the ALJ's residual functional capacity assessment in his opening brief, and therefore they are not properly before the Court for consideration here as well.

VII.     The ALJ's Step Five Analysis

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the hearing, the ALJ posed a hypothetical question to the vocational expert containing the same limitations as were included in the plaintiff's residual functional capacity as assessed in the absence of his substance abuse. Tr. 622. In response to that hypothetical question, the vocational expert testified that there were other jobs an individual with the same age, education, skills, and residual functional capacity as plaintiff could perform. Tr. 622-23. Based on the vocational expert's testimony, the ALJ found that in the absence of his substance abuse, plaintiff was able to perform other jobs existing in substantial numbers in the national economy. Tr. 35.

Plaintiff argues the hypothetical question the ALJ posed to the vocational expert did not include all of his functional limitations. Given the ALJ's errors in evaluating the medical opinion source evidence in the record and in assessing plaintiff's residual functional capacity discussed above, the undersigned agrees. Accordingly, remand for further consideration of plaintiff's ability to perform other jobs at step five of the sequential disability evaluation process is warranted as well. Plaintiff further argues, however, that based on the vocational expert's testimony – that if the above hypothetical individual lost focus or concentration up to one-third of the time as well, or had problems with sleep resulting in being unable to make it through

a full workday at least twice a month, competitive employment would be ruled out – remand for an outright award of benefits is proper. The evidence in the record, though, does not clearly establish plaintiff actually suffers from such limitations. This additional argument thus is rejected.

VIII.    <u>This Matter Should Be Remanded for Further Administrative Proceedings</u>

The Court may remand this case "either for additional evidence and findings or to award benefits." <u>Smolen</u>, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." <u>Benecke v. Barnhart</u>, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." <u>Id.</u>

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." <u>Smolen</u>, 80 F.3d at 1292; <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

<u>Smolen</u>, 80 F.3d 1273 at 1292; <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues remain in regard to the medical opinion source evidence in the record, the materiality of plaintiff's alcohol and drug use, plaintiff's residual functional capacity, and his ability to perform other jobs existing significant numbers in the national economy, this matter should be remanded to the Commissioner for further administrative proceedings.

It is true, as plaintiff asserts, that if an ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter of law." <u>Lester</u>, 81 F.3d at 834 (citation omitted). However, where the ALJ is not required to find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and thus the <u>Smolen</u> test will not be found to have been met. <u>Bunnell v. Barnhart</u>, 336 F.3d 1112, 1116 (9th Cir. 2003). Here, as discussed above, in light of the outstanding issues that still need to be resolved, it is not clear the ALJ would be required to find plaintiff disabled based on the medical evidence in the record, and therefore remand for further proceedings is warranted.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

the parties shall have ten (10) days from service of this Report and Recommendation to file written

objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those

objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit

imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **June 12, 2009**,

as noted in the caption.

DATED this 20th day of May, 2009.

Karen L. Strombom
United States Magistrate Judge